IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JEREMY W. BENZ,

                Plaintiff,                        CV-10-519-ST

      v.                                   FINDINGS AND
                                          RECOMMENDATION

WEST LINN PAPER COMPANY,

                       Defendant.

STEWART, Magistrate Judge:

**<u>INTRODUCTION</u>**

Plaintiff, Jeremy Benz ("Benz") originally filed this action against his former employer,

West Linn Paper Company ("WLPC"), in Clackamas County Circuit Court on March 25, 2010.

*See* Notice of Removal, Ex. 1, Complaint, filed in *Benz v. West Linn Paper Company*, Case No.

CV1003-0792.  Benz alleges claims for violation of:  (1) Oregon law on Unlawful Employment

Practices, ORS 659A.112(2) (failure to make reasonable accommodations for disability and

1 - FINDINGS AND RECOMMENDATION

termination due to disability) (First Claim); (2) the Family Medical Leave Act ("FMLA"),

29 USC §§ 2601-2654 (Second Claim); and (3) the Oregon Family Leave Act ("OFLA"),

ORS 659A .150-.186 (Third Claim).

On May 4, 2010, WLPC filed a Notice of Removal to this court.  This court has federal

question jurisdiction over the federal statutory claim pursuant to 28 USC § 1331 and

supplemental jurisdiction over the related state law claims pursuant to 28 USC § 1367(a).

WLPC has filed a Motion for Summary Judgment (docket #17) against each of Benz's claims.

For the reasons that follow, the motion should be GRANTED and a judgment should be entered

in favor of WLPC.

## <u>STANDARDS</u>

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert

denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986). In employment discrimination cases, "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, upon a full record. " *Schnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir) (internal quotations, citation omitted), *cert denied*, 519 US 927 (1996).

## FACTS

Because all material facts must be viewed in the light most favorable to the non-movant, this court views the evidence most favorably to Benz. A review of the parties' submissions[1] reveals the following facts:

## I.  WLPC Operations and Policies

### A.  Operations

WLPC specializes in making glossy paper used primarily in magazines and catalogs. WLPC's production process consists of three departments: (1) Stock Preparation (Stock Prep); (2) Coating; and (3) Paper Processing. Konen Decl., ¶ 2. The plant operates continuously, 24 hours a day, 365 days a year. Benz Depo., pp. 83-84; Dunlap Decl.,¶ 3. The make-up of a particular grade of paper is determined by the stock preparation. The Stock Prep Department is

---

[1] The parties have submitted documents with various attachments. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration or to the page(s) of the deposition transcript.

responsible for mixing the pulp that is pumped to the Paper Processing Department where it is used to make paper.  Konen Decl., ¶ 3.

The Paper Processing Department has three process lines with paper machines ("PM") #1, #2, and #3.  The process starts at the "wet end," where wet pulp is sprayed onto a wire mesh screen and the water drains out below it.  From there, the paper goes through a series of rollers.  During this process, the pulp fibers are compressed into sheets and the moisture content of the paper is reduced.  When the paper gets to the "dry end," coating is applied.  Thin blades scrape off the excess coating to insure a smooth, level finish or profile.  The coated paper then goes to the Supercalendar machine where a series of rollers apply heat and pressure.  The Supercalendar controls how glossy the paper finish will be.  From there, the paper goes to quality control, after which it is cut, wrapped and shipped to the customer.  *Id*, ¶ 4.

### B. <u>Employee Handbook</u>

WLPC employees are not guaranteed a specific job.  Dunlap Decl., ¶ 5.  Employees are assigned a job classification and then assigned to different roles based on business needs.  *Id*, Ex. 1, p. 7, &  Ex. 2, p. 7.  Employees are expected to help out in any area as needed.  *Id*.  WLPC maintains an Employee Handbook that it updates periodically.  *Id*, ¶ 4.  Employees receive their own copies of the handbook and sign an acknowledgment when they receive the handbook and any updates to it.  *Id*.  The current version of the handbook is always available to employees at the work site.  *Id*.

Benz received an employee handbook when he started work.  Benz Depo., p. 29 & Ex. 1.  He understood that WLPC could move employees around for business reasons and cross-train them for the efficiency of the mill.  *Id*, pp. 38, 41.  He was familiar with the family medical leave

4 - FINDINGS AND RECOMMENDATION

("FML") policy and knew when and how to ask for FML. *Id*, pp. 41-44. Benz understood that
FML and pre-arranged time off were excused. *Id*, pp. 108-09; Dunlap Decl., Ex. 1, pp. 14-15, &
Ex. 2, pp. 16-17.

### C. WLPC Work Schedule and Leave Requests

During Benz's employment, the work schedule at WLPC was set for the entire year.
Benz Depo., p. 86. In one year, WLPC shift employees only work about six months. *Id*; Dunlap
Decl., ¶ 3. Shift employees in Paper Processing work rotating 12-hour shifts for a total of 14
shifts. Dunlap Decl., ¶ 3. The shift schedule rotates between days and nights and over
weekends, with either four or five days off between each rotation. *Id*. The schedule repeats
every 28 days. *Id*. Due to the extensive amount of time off, WLPC expects employees to
schedule personal appointments on their days off whenever possible. *Id*.

Employees needed sufficient accrued paid time off ("PTO") to cover their absences and
usually could not take unpaid time off. Benz Depo., p. 89. They were expected to request PTO
in advance when possible, preferably with two weeks' notice, although short-notice requests
were allowed. *Id*, pp. 87-88; Dunlap Depo., p. 70. For short notice requests, an employee had to
be available to fill in. Benz Depo., pp. 88-89. There was a short-notice form for less than three
days notice. *Id*, p. 88; Dunlap Depo., p. 73. Team leaders had the authority to grant or deny
PTO. Dunlap Depo., pp. 71-72. One such person was Steve Kendig ("Kendig"), the Team
Leader for PM #3. *Id*, p. 87. Only two people (or three in the summer) per week could have
time off at any one time. *Id*, p. 88.

Employees were not supposed to take unpaid time off unless it was an emergency. *Id*,
p. 89. An employee called the guard shack at the gate to report an immediate time off due to an

illness or similar emergency.  *Id*, p. 107; Dunlap Depo., p. 75.  The employee was to inform the

guard of his name, where he worked, what process lines would be impacted by his absence, and

the reason for missing work.  Benz Depo., pp. 107-08.  In the event that an employee called in to

report an absence, Kendig made the decision about whether to call in someone else or run the

shift as is.  *Id*, pp. 83, 86.  Either Kendig or Jeff Kestek ("Kestek"), then Superintendent of PM

#3 and supervisor on all shifts, was responsible for approving time off not scheduled in advance.

*Id*, pp. 83-84, 87.

In general, supervisors talked to employees about having more than five unprotected

absences in one year.  Dunlap Depo., p. 76.  Unprotected absences are defined as those absences

which are not protected by the medical leave laws, jury duty, or the bereavement policy.  *Id*,

p. 77.  The communications between the supervisors and the employee with respect to five or

more unprotected absences were supposed to be documented in the employee's file.  *Id*, pp. 79-

80.

## II.  Prior to Development of Throat Condition

### A.  Initial Employment

Benz started working at WLPC on July 4, 2005, as a Repulper in the Stock Prep

Department.  Benz Depo., p. 17.  After two weeks of hands-on training with the other employees

in the department, he was proficient and did not need anyone to work with him.  *Id*, pp. 20, 27-

28, 53.  As a Repulper, Benz was responsible for loading pre-baled pulp onto a conveyor, cutting

and disposing of the wires that hold the bales together, maintaining consistency of the pulp once

it went into a repulper, turning off and draining the repulper in the event it became plugged, and

maintaining pulp inventory, which sometimes included unloading the truck.  *Id*, pp. 20-21.  He

could change the mix in the repulper with the push of a button. *Id*, pp. 49-50. To switch the mix in the repulper from one type of pulp to another, Benz would enter a new recipe or different consistency in a computer located in the cool shack. *Id*, pp. 50-51. The Repulper worked alone in the cool shack which was a separate building. *Id*, p. 21. If Benz needed to contact someone, he used a radio or a telephone located in the cool shack. *Id*, pp. 48-49.

**B.  Advancement**

New hires at WLPC are assigned a pay rate or "Tech level" that initially advances based on tenure. Dunlap Decl., ¶ 11. After achieving Tech level 2, employees cannot advance without going through a process that involves a written test, a demonstration of skills, and a peer evaluation. *Id*. Each department has a compensation/Tech level range. *Id*.

Benz received automatic pay increases when he advanced to a Tech 1 after 30 days and to a Tech 2 after 60 days. Benz Depo., p. 28. To advance to a Tech 3 or higher pay level, Benz had to pass a three-part test that included a demonstration of skills, a written test, and a peer evaluation. *Id*; Dunlap Decl., ¶ 11. Benz took the test and progressed to a Tech 3 when he was still in Stock Prep. Benz Depo., pp. 29, 75.

To bid on a job opening, employees submitted a letter of interest and then interviewed, usually with the crew. *Id*, p. 77. Employees who advanced a position in their own department retained the same Tech level. *Id*, pp. 75-76. However, to promote the retention of employees in jobs for which they were already trained, employees who switched departments were usually moved back to a Tech 3. *Id*.

///

///

7 - FINDINGS AND RECOMMENDATION

**C.  February 2006 Move to Rereeler Position & Disciplinary Suspension**

In February 2006, about seven months after his initial employment with WLPC, Benz successfully bid on the Rereeler position in Paper Processing on PM #3.  *Id*, pp. 26-27.  The Rereeler was responsible for pre-shift inspections of the overhead crane and transporter, re-reeling the paper that came off the machine, slabbing paper, changing paper knives, running a transporter, checking for defects on the rereeler, assisting with threading the paper machine, and cutting out any holes in the sheet.  *Id*, pp. 92-94, 96-97.  Benz received no change in pay.  *Id*, p. 27.

While Benz worked as a Rereeler on PM #3, Reed Rotondo ("Rotondo") was the Coaterman; Mike Long ("Long") was the Backtender; Kendig was the Machine Tender; Roland Bugni ("Bugni") was the Stack Operator; and, Tom Cook ("Cook") was the Winderman.  *Id*, pp. 89-90.  Kendig was the Team Leader.  *Id*, pp. 83-84; Kendig Decl., ¶ 1.  Kendig could approve requests for time off, but did not make Benz's schedule, did not conduct performance evaluations and had no authority to threaten or impose discipline.  Benz Depo., pp. 86-87; Kendig Decl, ¶ 2; Konen Decl., ¶ 5.

Shortly after the move to Rereeler, Benz received his first disciplinary suspension for placing rotted food in a co-worker's knife scabbard as a prank.  Benz Depo., pp. 97-98 & Ex. 6.  Benz's co-worker, Rotondo, brought out a stinky concoction of rotted food and took the knife scabbard of another employee, Joe Sullins ("Sullins"), out of an unlocked locker.  *Id*, pp. 97-98.  Rotondo encouraged Benz to put the concoction in Sullins's knife scabbard, which Benz did.  *Id*.  Sullins reported the incident to Brian Konen ("Konen"), WLPC's General Manager.  *Id*.  When efforts to identify the responsible employees proved unsuccessful, Konen called the team to a

meeting in his office.  *Id*, pp. 101-02; Konen Decl., ¶ 7.  WLPC ultimately suspended Benz for his role in the incident, effective May 13, 2006.  Benz Depo., pp. 97, 109 & Ex. 6.

Benz had unexcused absences the next day, May 14, and again on May 21, but was not disciplined in any way for those absences.  Dunlap Decl., ¶ 16 & Ex. 6, pp. 1-2; Benz Depo., pp. 107, 110-11.

### D.  Advancement to Tech 4 and Move to Coaterman

About seven months later, Benz advanced to a Tech 4 with no change in his duties, effective December 31, 2006.  Benz Depo., pp. 111-13; Dunlap Decl., ¶ 17.  In late 2006 and early 2007, PM #3 was short handed and Benz began to fill in as the Coaterman.  Benz Depo., Ex. 9.  The Coaterman is responsible for maintaining the sheet profile and paper quality by making adjustments while coating is applied to both sides of the paper and for helping the Rereeler and Backtender.  *Id*, pp. 82-83.

In March 2007, Benz put in a bid to become the Coaterman on PM #3.  *Id*, p. 115.  By that time, Benz had been performing the Coaterman job between four and six months.  *Id*.  Sometime in the late spring or summer of 2007, Benz was awarded the bid for the Coaterman job on PM #3.  *Id*, pp. 118-120; Dunlap Decl., ¶ 17.  Although the Coaterman position is more complicated, Benz stayed at the same tech level and his pay stayed the same.  Benz Depo., p. 117.

### E.  2007 FML

In January 2007, Benz took FML in connection with the birth of his child.  *Id*, pp. 113-14, & Ex. 8.  He was not disciplined or retaliated against in any way for taking the FML.  *Id*, p. 114.

The following summer, in July 2007, Benz called in sick due to an off-work injury to his

wrist. *Id*, pp. 120-21. He returned to work with a partial cast but no doctor's note. *Id*, pp. 121-23. Benz's uncle, Bill Benz (the Production Manager in charge of all three paper machines), told Benz he could not return to work without a note explaining his restrictions. *Id*, pp. 18-19, 124. Benz obtained a doctor's note restricting him from lifting anything over two pounds, and returned to work at his regular job within his restrictions. *Id*, pp. 123-24 & Ex. 11. He was not disciplined or retaliated against in connection with his wrist injury. *Id*, p. 126.

### F. December 2007 Tech 5 Test

In December 2007, Benz took the test to advance to a Tech 5, but did not pass. *Id*, pp. 126-27 & Ex. 12. Benz also failed to meet expectations in several categories of his peer evaluations.[2] Dunlap Decl., ¶ 18 & Ex. 7.

### G. 2008 Unexcused Absences

Benz had unexcused absences on January 29 and March 4, 2008. Benz Depo., pp. 130-31; Dunlap Decl., ¶ 19 & Ex. 8. He was not disciplined for those absences. Benz Depo., p. 131. Kathy Lakey ("Lakey"), the individual in HR who is primarily responsible for administering WLPC's FML policy, told Benz to fill out an FML request for absences due to his wife's illness on April 12 and 13 because his time off qualified for FML and would be excused. *Id*, pp. 46, 131-33 & Ex. 14. Benz was not disciplined or retaliated against in connection with those

---

[2] Benz's peers were critical of his performance, commenting as follows on the following skills areas: (1) Quality Skills: "Does testing but needs to be better about follow-up. Has a habit of asking 'How much paper have we lost' before working on issues" (Dunlap Decl., Ex. 7, p. 1); (2) Safety Skills: "Does a little moaning and groaning when asked to do monthly safety inspections. There's little or no follow up after the inspection. Rarely does much cleaning unless asked, but getting better about cleaning around coaters." (*id*, p. 2); (3) Team Skills: "He has gotten better about time management but still has room to grow. There have been some issues with his behavior. Reluctant to listen to authority. Takes criticism to heart and easily offended when corrected." (*id*, p. 3); (4) Team Skills: "Needs to communicate issues with people on this crew a little better. Picks and chooses what info to relay occasionally. He asks a lot of questions, but asks the same questions over and over. Needs to be shown certain things over and over." (*id*, p. 4); and (5) Team Skills: "Does not lead by example. Needs to be better at working as a team instead of being the '"leader.'" (*id*, p. 5). Benz either did not understand or did not agree with any of his co-workers' comments. Benz Depo., pp. 128-30.

absences.  *Id*, p. 134.  Benz had another unexcused absence on June 4, for which he was not

disciplined.  *Id*.

### III.  <u>Development of Throat Condition</u>

####     A.  <u>Initial "Voice Change"</u>

Some time between January and May 2008, Benz began to experience difficulties with his

voice.  *Id*, pp. 139-43.[3]  By mid-July 2008, his coworkers and WLPC management knew he was

having throat difficulties.  *Id*, pp. 140-43.  He could hardly talk, was not sleeping well, and was

very difficult to understand.  *Id*, p. 139.  Over the course of about three months, his "voice

changed," he became hoarse, and he was "having issues with people understanding [him] at

work."  *Id*, pp. 139-43, 174, 199.  Benz did not know what was causing the problems with his

voice.  *Id*, p. 140.  Although he had health insurance, he avoided going to see a doctor to avoid

the associated out-of-pocket costs.  *Id*, p. 174.

Despite the fact that his "voice was gone" and he was not getting enough rest, Benz

continued working.  *Id*, p. 139.  When asked what was wrong with his voice, he would respond

that he had "no idea" and thought that he was losing his voice.  *Id*, p. 140.  This went on for

"weeks on end."  *Id*, p. 142.  With the exception of Bill Benz, who laughingly told Benz that he

had a "cure for that" (*id*), Benz's coworkers and WLPC management uniformly expressed their

hope that Benz's voice would "get better."  *Id*, pp. 142-43.

///

///

---

[3]  Benz later testified that his voice was hoarse for "three to five months" before his August 20, 2008 doctor's appointment, then clarified that it was "[p]robably close to three months."  Benz Depo., pp. 173-74.

**B.  Summer 2008 "Horseplay" Incident and Absence**

On June 9, 2008, Benz was involved in a reportable safety incident in which Brian Viera

("Viera") (Bill Benz's son-in-law) cut his finger and required stitches.  *Id*, pp. 116, 134.  Viera's

utility knife came out of its scabbard when Benz tugged on his shirt to get his attention.  *Id*,

p. 135.  Although Benz was not disciplined for his role in the incident, WLPC management

believed it was the result of horseplay.  *Id*, p. 137; Dunlap Decl., ¶¶ 20, 26 & Ex. 11 (9/9/08

meeting with Kendig; 9/26/08 conversation with Bill Benz); Konen Decl., ¶ 8; Bill Benz Decl.,

¶ 4.

On July 12, 2008, Benz missed work because he had to take his son to the emergency

room for a head injury.  Benz Depo., p. 137.  He used PTO to cover his absence.  *Id*, p. 138.

WLPC was unable to find someone to work during that absence and Benz's crew had to run the

machine short-staffed.  *Id*.  However, Benz was not disciplined for missing that shift.  *Id*.  He

sent an email to Konen, apologizing for the difficulties caused by his absence on July 12 and

letting him know he would "give 120% effort" to his job.  *Id*, pp. 138-39 & Ex. 15.

**C.  "Pole Incident" and Production Issues After Rotondo's Departure**

Rotondo, the Backtender on Benz's crew, left WLPC's employ on August 1, 2008.

Dunlap Decl., ¶ 21.  Shortly thereafter, Benz and another employee, Scotty Stewart ("Stewart"),

dropped a heavy pole and caused significant damage to a mesh screen or "wire," an expensive

piece of equipment on which the pulp is sprayed.  *Id*; Benz Depo., p. 145.  Benz heard "through

the grapevine" that the accident was believed to be his fault, but was not disciplined for it.

Dunlap Decl., ¶ 21; Benz Depo., pp. 145-46.  WLPC contends that Benz's work performance

went into a "downhill spiral" following Rotondo's departure and the "pole incident."  Kendig Decl., ¶ 4.

### D. **August 11, 2008 Paper Loss and Damage**

On August 11, 2008, Benz filled in as Backtender on the night shift.  *Id*, ¶ 5; Benz Depo., p. 146 & Ex. 16.  During the shift, the sheets coming from the machine had holes in them, the result of holes in the wire.  Benz Depo, pp. 148-49.  This resulted in a large loss of paper and damage to the Supercalendar machine which required a shut down of the entire PM #3 process line in order to make repairs.  Kendig Decl., ¶¶ 5-6.  Kendig felt Benz shirked his responsibilities and was ticked off at Benz for failing to notify him of the problems so that the loss of paper and required repairs could have been minimized.  *Id*.

This was not Kendig's first concern over Benz's performance.  *Id*, ¶ 7.  He witnessed and received complaints about Benz talking on his cell phone when he should have been working.  *Id*.  Kendig would find Benz on the phone, in the lab, not making rounds, doing everything but what he should have been doing.  *Id*.  He spoke to Benz repeatedly about being on the phone and adjusting his coating profiles, which were worse than when Benz first started as Coaterman.  *Id*.  Kendig felt the downturn in Benz's performance was because Rotondo had been doing Benz's profiles for him.  *Id*, ¶ 8.  Benz made excuses for his profile problems, denying the issue was his problem and blaming others.  *Id*.  Benz would say he was taking notes while training, but Kendig never saw it and did not believe him.  *Id*.  Rotondo had complained to Kendig that Benz did not take notes and refused to give Benz his notes when he left.  *Id*.  Kendig's issues with Benz's performance echoed the concerns that Benz's peers had identified back in December 2007. Dunlap Decl., Ex. 7.

Kendig had previously discussed his concerns about Benz's performance with both Kestek and Bill Benz. Kendig Decl., ¶ 9; Kestek Decl., ¶ 7; Bill Benz Decl., ¶¶ 6-7. They told Kendig to keep coaching Benz. Kendig Decl., ¶ 9. Kendig and Bill Benz also talked about moving Benz to the Rereeler position for a couple of rotations because of the performance issues. *Id*; Bill Benz Decl., ¶¶ 7, 9. After the problems on August 11, 2008, word traveled that Bill Benz did not want Benz filling in as Backtender any more. Konen Decl., ¶ 10 & Ex. 2.

**E. August 18, 2008 Suspension**

Benz was originally scheduled to work August 18 through 21, be off for five days, and return on August 27, 2008. Benz requested Monday, August 18, off work as vacation time for a trip he planned to take to Idaho. Benz Depo., p. 158. Kendig, Kestek, and Bill Benz told Benz that he did not have enough PTO to take the day off. *Id*, pp. 158-59. They called the payroll department and learned that Benz did have enough PTO to take off the Monday he requested. *Id*, p. 159. They then told Benz he could have the day off, but Benz told them that if it was that big of a hassle, he did not need to take the day off and said he would be at work on the Monday, August 18. *Id*.

On Sunday, August 17, while Benz was returning to Oregon, his motor vehicle broke down in Connell, Washington. *Id*; Kestek Depo., p. 31. Benz had to wait until Monday for the vehicle to be repaired and finally made it home Monday evening. Benz Depo., p. 159.

On Tuesday morning, August 19, Benz reported to work and worked all day. *Id*, p. 160. At the end of his shift, Kestek called Benz into his office and told Benz he was being suspended, effective the following day, for missing work on Monday. *Id*, p. 166 & Ex. 19. Benz was suspended without pay for Wednesday night and placed on a six month reprimand. *Id*. Benz did

not challenge the suspension.  *Id*, pp. 165-66.  Bill Benz was out of town at the time and knew

nothing about the suspension until after the fact.  Bill Benz Decl., ¶¶ 5, 12.

### F.  <u>August 19, 2008 Paper Loss</u>

On August 19, 2008, when Benz was working as a Coaterman on the day shift, there were

nine breaks on the line which required the Rereeler to sandpaper the rolls where the ringer was

causing coating lumps.  Benz Depo., pp. 166-167.  The problem with coating lumps resulted in a

huge paper loss.  Kendig Decl., ¶ 10 & Ex. 2.  Between the two shifts, PM #3 lost 19 tons of

paper that day with over 16 tons lost on the day shift.  *Id*.  Coating lumps may have caused the

damage, but they normally do not damage the rolls because they can be washed out and watered

down.  Benz Depo., p. 169.

Kendig was the first to hear from management about a production loss of that size, and he

was not happy about it.  Kendig Decl., ¶ 10 & Ex. 2.  Since Benz was the Coaterman that day,

coating lumps were his responsibility.  *Id*; Benz Depo., pp. 166-67.  Kendig talked to Benz about

the coating lumps, but Benz denied responsibility, saying that he had not been properly trained.

Kendig Decl., ¶ 10.   Kendig knew this was not true as he had coached Benz repeatedly on this

issue.  *Id*.

### G.  <u>August 21, 2008 – First Throat Surgery</u>

During his vacation in Idaho the weekend of August 16-17, 2008, Benz ran out of breath

and could not breath while swimming.  Benz Depo., pp. 158-59, 174.  After he came home from

his shift on August 19, 2008, his wife noticed that he stopped breathing in his sleep.  *Id*, p. 160.

She made him a doctor's appointment for the following morning.  *Id*.  At the August 20, 2008

appointment, Benz's breathing was "wheezy," and Dr. Kelly Rydland discovered what he

thought was a fatty tissue tumor in Benz's throat that was "blocking most of his airway." *Id*, pp. 173, 175 & Ex. 21, p. 1.

After leaving the doctor's office, Benz called work to advise he would be out for surgery on August 21, 2008. *Id*, pp. 162-63, 173. Kestek told Benz to contact Lakey to arrange for FML. *Id*, p. 173. Benz did not turn in his FML request until after he returned to work. *Id*, pp. 189-90 & Ex. 25 (9/8/2008 FML request); Dunlap Decl., ¶ 23.

Benz had surgery on August 21, 2008. Benz Depo., p. 177. He recovered in less than a week and had no reason to believe he would experience a recurrence. *Id*, pp. 176-77. He returned to work without restriction six days post-surgery on August 27, 2008. *Id*, p. 178. Dr. Rydland did "not expect long term need of medication or [treatment] after surgery." *Id*, Ex. 21. When he returned to work, Benz told his coworkers that he had a benign fatty tissue tumor removed from his airway. *Id*, p. 179. WLPC had no other information about Benz's condition other than his medical certification which indicated he would not need medication or follow-up treatment. *Id*, pp. 171, 189 & Ex. 21; Dunlap Decl., ¶¶ 23-24.

**H.  Reassignment to Rereeler Position**

For Kendig, the August 19, 2008 paper loss was "the last straw" in what Kendig viewed as a series of performance issues. Kendig Decl., ¶ 11. Kendig had already initiated discussions with Bill Benz about moving Benz back to the Rereeler position and, after the August 19 paper loss, was "pushing to get it done." *Id*. Bill Benz and Kendig agreed that Benz should be moved back to Rereeler for one or two rotations, but Bill Benz left it to Kendig to decide how long Benz should stay as a Rereeler. *Id*.

On August 27, 2008, Benz's first day back after his throat surgery, Bill Benz notified him that he was temporarily being moved to the Rereeler for quality issues. Benz Depo., pp. 158, 161, 193.[4] Benz's schedule stayed the same with no change in his pay or benefits. *Id*, pp. 157, 201.

WLPC had previously assigned Benz to Rereeler after moving to Coaterman which Benz did not consider a demotion. *Id*, pp. 157-158 & Ex. 5, pp. 1-6; Bill Benz Decl., Ex. 1 (2/22, 2/23 and 3/22/08 entries). However, this time Benz complained to Dunlap about the move because he thought the reassignment to Rereeler was related to his surgery and use of FML. Benz Depo., pp. 158, 191 & Ex. 26. Dunlap was off work and unaware of the circumstances of Benz's move, but said he would investigate when he returned to the office. Dunlap Decl., ¶ 25 & Ex. 10.

Dunlap learned that the decision to move Benz to the Rereeler was based solely on his performance. *Id*, ¶ 26 & Ex. 11. Benz had six unexcused absences in the past 12 months, five of which were since the first of the year. *Id*. There were complaints about his coating profiles, his ability to trouble shoot coating issues, and his working relationships with his team. *Id*. The move was temporary to give Benz a chance to sharpen his skills. *Id*.

Dunlap and Lakey met with Benz on September 8, 2008. *Id*, ¶ 26. Although Benz acknowledged that Bill Benz had spoken to him about his performance, Benz felt he was doing a good job and was surprised to hear the crew felt otherwise. *Id*, ¶ 27. He blamed the problem on his lack of experience and Viera's failure to notify him of quality issues. *Id*, Ex.11, pp. 3-4; Benz Depo., pp. 191-92 & Ex. 27.

---

[4] WLPC denies that the move had anything to do with Benz's surgery or use of FML. Kendig Decl., ¶¶ 12, 18; Bill Benz Decl., ¶¶ 9-11; Kestek Decl., ¶¶ 8-9; Dunlap Decl., ¶¶ 6, 24, 26-28, 31; Ex. 10.

After meeting with Benz, Dunlap continued his investigation.  Dunlap Decl., ¶ 28.  He confirmed with Kendig that Benz was moved back for performance reasons and was unreceptive to coaching.  *Id*.  Benz said he felt the criticism of his performance was undeserved – that he was being picked on by Bill Benz.  *Id*.

Kestek reported to Dunlap that he and Bill Benz had jointly agreed to move Benz back to Rereeler prior to his suspension and left it up to Kendig to determine when.  *Id*, ¶¶ 29, 31 & Exs. 12 & 13; Kestek Decl., ¶ 9; Bill Benz Decl., ¶ 7.  Kendig said he was prepared to move Benz back to Coaterman after two weeks, but after talking to Benz, agreed to leave him on Rereeler until Benz decided whether or not he wanted to stay in the department.  Dunlap Decl., ¶¶ 28-29 & Ex.11, pp. 2-3 & Ex. 12.  In all, Benz was on the Rereeler for about two and a half weeks before being moved back to Coaterman.  *Id*, ¶ 31; Bill Benz Decl., ¶ 9 & Ex. 1; Benz Depo. Exs. 5 & 6

## IV.  December 2008 Second Surgery

Benz had no further issues with his throat for the next three months.  Benz Depo, p. 211.  By mid-November 2008, Benz thought the mass was coming back in his throat and again saw Dr. Rydlund on November 25, 2008.  *Id*, pp. 204, 208.  Dr. Rydlund was still uncertain what the growth was and advised Benz he would remove it again, but if it grew back, would send Benz to a specialist at Oregon Health Sciences University.  *Id*, pp. 204-05.

Benz had a second surgery on December 1, 2008.  *Id*, p. 205 & Ex. 28.  WLPC has no record of Benz requesting FML for his second surgery, and no one in Benz's chain of command or Human Resources has any recollection of it.  Dunlap Decl., ¶ 32; Kendig Decl., ¶ 18; Kestek Decl., ¶ 5; Bill Benz Decl., ¶ 11.  After that surgery, Dr. Rydlund advised Benz to avoid vigorous

activity for a week.  Benz Depo, pp. 209-10 & Ex. 28.  Benz returned to work on December 8,

2008, and experienced no further symptoms until late March 2009.  *Id*, pp. 210-13.

## V.  2009 Leave Dispute, Recurrence of Throat Lesion and Third Surgery

### A.  January 2009 Leave Dispute

On January 4, Benz reported that he was taking three days off for the death of his

grandfather, starting January 5, 2009.  *Id*, pp. 214-15; Dunlap Decl., ¶ 33 & Ex. 14.  The person

who passed away was actually Benz's step-grandfather.  Benz Depo., p. 214.   According to

Benz, his grandmother's husband, or step-grandfather, "was the only grandfather he had known –

since his birth 28 years ago this was his grandfather."  Dunlap Decl., Ex. 16.

WLPC's bereavement leave policy permits up to three days of leave for the death of an

immediate family member, including a "parent, stepparent, parent in-law, child, stepchild, [and]

grandparent," but says nothing about leave for the death of a "step-grandparent."  *Id*, Ex 1, p. 8.

Benz and Bill Benz got into a dispute over whether Benz could use bereavement leave for the

death of his step-grandfather, and Benz turned to Dunlap with the dispute.  *Id*, ¶ 34 & Ex. 15.

Eventually, Benz was granted time off without pay by Konen, who is the only person who can

grant such time off and who does so only on rare occasions.  Konen Decl., ¶ 11.

### B.  April 2009 Third Surgery

In late March 2009, Benz began to experience "weird talking again."  Benz Depo.,

pp. 212-13.  At an appointment for his son, an ear, nose, and throat specialist Dr. Suzanne

Cleland-Zamudio asked Benz about his hoarse voice.  *Id*, p. 212.  When he told her he had

already had two surgeries for the problem, she suggested he make an appointment with her.  *Id*,

pp. 212-13.  On April 3, 2009, Dr. Zamudio examined Benz and determined that he needed a

third surgery on his throat. *Id*. She told Benz that the growths he was experiencing were vocal chord polyps that were recurring, possibly due to his vocal chords hitting each other too hard or due to the presence of inhaled irritants that were retraumatizing the area of polyp growth. *Id*; Zamudio Depo., pp. 23-24, 50.

At the April 3, 2009 appointment, Benz scheduled surgery for April 30, so that his recovery would be on his days off. Benz Depo., pp. 219-21. Dr. Zamudio advised Benz not to eat or drink anything after midnight before the operation, how much time he would need to be off work, and about post-operative care, which included wearing a mask at work and resting his voice (*i.e.*, speaking at a conversational tone, not raising his voice, not whispering). Zamudio Depo., pp. 38-39, 50-52. Benz told Dr. Zamudio he would ask about voice rest, but his job required that he yell over machinery, so he was more concerned about having adequate time off. *Id*, p. 39.

When Benz returned to work the following week, he advised Kestek that he would be having surgery on April 30, 2009. Benz Depo., p. 221. He told the crew that he was having surgery for same thing with a new surgeon who seemed to be more knowledgeable. *Id*, p. 222. On April 22, 2009, Dr. Zamudio faxed a FMLA health care certification to WLPC, stating that Benz was having surgery on April 30, 2009, and would be "incapacitated until post surgical clearance [was] given." *Id*, Ex. 30, p. 2.

## VI.  Events Resulting in Termination

### A.  April 29, 2009 "Walk off"

Benz was scheduled to work the night before his surgery from 5:00 p.m. on April 29 until 5:00 a.m. on April 30, 2009. *Id*, p. 228. Sometime on April 29, Benz called Kestek and

20 - FINDINGS AND RECOMMENDATION

requested that he be allowed to have the night off, explaining that, because of his surgery, he would not be able to eat or drink anything during the last six or seven hours of his shift.[5]  *Id*, p. 225.  Benz considered seven hours at work without eating or drinking to be a safety hazard because he works in a hot environment and has to drink a lot of fluids to keep hydrated.  *Id*.  He told Kestek that he did "[not] feel it would be a great idea . . . to come in and work . . . roughly six or seven hours without food or water."  *Id*, pp. 225-26.  Kestek told Benz they were short-handed and did not think Benz could take the entire shift off, but would ask Kendig (Team Leader for PM #3) if he could leave after half a shift.  *Id*, pp. 226, 228.  Benz agreed to that proposal.  *Id*, p. 226.

After arriving at work, Kendig told Benz that he may be able to leave between 11 p.m. and midnight.  *Id*, p. 228.  At around 7:00 p.m., Benz got into an altercation with Bugni.  *Id*, p. 231.  Benz called Kendig and told him he was going home because he was "pissed," "flaring," "mad," and "angry," had another surgery in the morning, and there was "no way [he could] work with [Roland Bugni] the rest of the night . . . under these terms."  *Id*.  Kendig responded "Okay. I'll see you next week," which Benz interpreted to mean he could go home.[6]  *Id*, pp. 231-32. Benz walked upstairs, changed his clothes, and left.  *Id*, p. 231.

///

///

///

---

[5]  WLPC asserts that, when asking for time off, Benz said that his surgery had been moved up two hours (Oberlin Decl., Ex. 9, p. 1), an assertion that Benz denies (Benz Depo., pp. 247-48).

[6]  Kendig denies telling Benz he could go home, and instead claims he told Benz to wait in the cook shack for him. Kendig Decl., ¶ 16.  When Kendig went to the cool shack, Benz was gone.  *Id*.

### B. **Third Throat Surgery**

The following morning, on April 30, 2009, Dr. Zamudio performed the third surgery on Benz's throat by excising the growth and injecting an anti-inflammatory steroid into the vocal chord to reduce the risk of recurrence.  Zamudio Depo., p. 50.

### C. **May 5, 2009 Disciplinary Meeting and Suspension**

After Benz left work on April 29, 2009, Brandon White ("White"), a helper, told Kendig that Benz had called Bugni a "dumb ass" which started the altercation between them.  Dunlap Decl., Ex. 17; Kendig Decl., ¶ 17.  Kendig reported the incident to Kestek, Bill Benz, and McGuigan (WLPC's Operations Manager) by email.  Kendig Decl., ¶¶ 16-17 & Ex. 4; Dunlap Decl., ¶ 36 & Ex. 17.

A few days later, Dunlap asked Benz to attend a meeting to discuss the April 29 incident. Dunlap Decl., ¶ 37.  On May 5, 2009, McGuigan, Kestek, Konen, and Dunlap convened a meeting with Benz.  *Id*, ¶ 37 & Ex. 18.  Benz denied calling Bugni a name; instead, he claimed that Bugni instigated the dispute by getting in his face, yelling and screaming at him.  *Id*.  WLPC management asked Benz to leave the room and called White at home.  *Id*.  White again relayed the story that Benz had called Bugni a "f***ing dumb ass," noting that Benz and Bugni had previously had disagreements, but never any so bad as the one on April 29.  *Id*, Ex. 18, p. 2.

At the conclusion of the meeting, Benz was placed on suspension pending further investigation, with approval to use PTO to cover the suspension.  *Id*, Ex. 19.  On May 8, 2009, Benz attended a follow-up meeting with Dunlap and Konen.  *Id*, ¶ 38 & Ex. 20.  Benz was given a Last Chance Agreement ("LCA") that required him to contact the Employee Assistance Program ("EAP") by the end of the day, undergo an assessment early the next week, follow

through with all recommendations made by the EAP, and transfer to the Stock Prep Department

with no change in pay or benefits.  *Id*; Konen Decl., ¶ 14; Benz Depo., p. 246 & Ex. 33.  In order

to save his job, Benz did not challenge any of the statements in the LCA.  Benz Depo.,

pp. 249-50.  He had no concerns about his ability to do the job in Stock Prep, other than not

having done it for a while.  *Id*, p. 253.  To lessen the financial burden on Benz, who did not have

sufficient PTO to cover the full suspension, WLPC paid him two days pay and left him with 12

hours in his PTO bank.  *Id*, p. 264; Dunlap Decl., ¶ 39 & Ex. 21.

### D.  May 2009 Return to Work

A patient undergoing vocal chord surgery typically would be fully healed in two to three

weeks.  Zamudio Depo., pp. 39-40.  At his follow-up appointment on May 12, 2009, Benz's

throat was still sore and his voice was still slightly hoarse.  *Id*, p. 46.

When Benz returned to work, he met with Dunlap and Dave Robertson.  Benz Depo.,

pp. 266-67.  Although Benz does not recall what Dunlap said during that conversation (*id*,

p. 267), Dunlap testified that he reviewed the medical visit note and asked Benz whether he

could do the Repulper job and abide by his restrictions, to which Benz responded that "it would

not be a problem."  Dunlap Decl., ¶ 43.

### E.  Last Chance Agreement and Termination

The LCA required Benz to make contact with EAP before 5:00 p.m. on May 8, 2009.

Oberlin Decl., Ex. 9, p. 2.  Benz did so and the EAP counselor reported to Dunlap that Benz had

presented himself well and seemed to want to complete the EAP procedure.  Dunlap Depo.,

p. 192.  Benz attended two more appointments with the EAP counselor on May 14 and 21, 2009.

Oberlin Decl., Ex. 11.  Benz rescheduled his next appointment to Wednesday, June 10, 2009, but

23 - FINDINGS AND RECOMMENDATION

forgot to write it on his calendar and consequently "spaced" going to it.  Benz Depo., pp. 273-74.

He did not think it would be a "big deal" if he rescheduled the missed appointment.  *Id*, p. 274.

However, that same day, Dunlap contacted the EAP counselor and was told that Benz had missed

his appointment and could not be reached.  Dunlap Decl., ¶ 46.  Another WLPC employee told

Benz that Dunlap was trying to get ahold of him, so Benz contacted him the next day.  Benz

Depo., p. 273.  Benz offered to immediately reschedule the appointment for as soon as EAP

could see him.  *Id*, p. 274.  Dunlap told Benz not to reschedule until WLPC decided what to do.

*Id*.

The following Monday, June 15, 2009, Benz met with Dunlap and Tom McGuigen

("McGuigen"), the Operations Manager, to discuss the situation.  *Id*, p. 275.  Dunlap and

McGuigen terminated Benz for missing the EAP meeting, explaining that it was like missing

work and, therefore, violated the LCA.  *Id*; Dunlap Depo., p. 208.  Konen and Dunlap were the

only two individuals who had input into the decision to terminate Benz, and Konen had ultimate

authority to terminate Benz.  Konen Depo., p. 94.

### F.  <u>Post-Termination</u>

Benz had another appointment with Dr. Zamudio on June 26, 2009.  Zamudio Depo.,

p. 53; Benz Depo., p. 279.  At that appointment, Dr. Zamudio prescribed a medication to make

Benz's throat less irritated and hopefully prevent the lesion from coming back.  Benz Depo.,

p. 281.  Benz made another appointment with Dr. Zamudio "some time in the winter" of 2009-

10, but had to reschedule.  *Id*, p. 279.  He has been unable to afford further treatment with

Dr. Zamudio  *Id*.  As of the date of Benz's deposition on September 28, 2010, the residual

symptoms were "hit and miss." *Id*, p. 281. His voice had not changed, but sometimes his throat "bugs [him and] sometimes it doesn't." *Id*.

## FINDINGS

### I. Statutes of Limitations

The First Claim, brought under ORS Chapter 659A, alleges that WLPC refused to accommodate and terminated Benz based on his difficulties with and need to be absent for work for treatment of his recurring vocal chord lesion. The two additional claims under the FMLA (Second Claim) and OFLA (Third Claim) similarly allege that WLPC took various adverse actions against him which interfered with his right to take medical leave protected under federal and state law. In that sense, the Second and Third Claims parallel the specifications of Benz's discrimination claim because they rely on allegations that he engaged in protected conduct by applying for and taking medical leave and suffered adverse employment actions as a consequence.

Benz's three claims span the time period after he first became aware of his throat condition in early to mid-2008 through his termination on June 15, 2009. Benz relates a hodge-podge of events that took place during that year and a half period, several of which he asserts constitute adverse employment actions causally tied to unlawful discrimination or interference with protected medical leave. Benz relies heavily on the temporal proximity between various events to support his claims. However, several of the alleged adverse employment actions are time-barred for purposes of his claim under the OFLA.

Oregon law imposes a one-year statute of limitations on Benz's discrimination claim. ORS 659A.875, 659A.885 (incorporating one-year limitation for claims brought under ORS

659A.100 to 659A.145 (disability discrimination) and ORS 659A.150 to 659A.186 (OFLA)).

Only the FMLA claim provides a longer statute of limitations of two years.  29 USC § 2617(c).

WLPC terminated Benz on June 15, 2009.  Benz filed this action in state court on March

25, 2010.  While WLPC's termination of Benz took place less than a year prior to the filing of

this action, some of the other alleged adverse actions fall outside of the one-year window.  As a

result, that earlier conduct may provide relevant background information, but will not

independently support Benz's disability discrimination or OFLA claims.

## II.  FMLA and OFLA Claims (Second and Third Claims)

As just noted, Benz's FMLA and OFLA claims allege violations that to some extent

parallel the types of violation alleged in his unlawful employment practices claim.  However,

because the FMLA and OFLA claims address a narrower range of allegedly improper conduct,

they are addressed first.

At the outset, it is worth noting that Benz does not contend that WLPC denied him any

protected medical leave.  Instead, Benz's FMLA and OFLA claims assert that WLPC took a

variety of adverse actions against him in retaliation for using medical leave, and that, as a result,

WLPC is liable for FMLA and OFLA violations.  As discussed below, Benz's FMLA and OFLA

claims fail either because:  (1) the alleged adverse action is outside of an applicable statute of

limitations; (2) Benz has failed to show any prejudice flowing from the alleged adverse actions

(the position reassignments); or (3) Benz has failed to show the necessary causal link between his

use of protected leave and the remaining adverse actions he complains of, including the alleged

denial of a half shift off on April 29, 2009, issuance of the LCA, reassignment in May 2009 to

Stock Prep, and termination.  Accordingly, WLPC should be granted summary judgment against the Second and Third Claims.

### A. __Legal Standards__

The Second and Third Claims allege that WLPC retaliated and discriminated against Benz by taking adverse actions against him, including "refusing to allow [him] time off of work without retaliation," "creating a hostile work environment," "demoting" him, and "terminating" his employment.  Complaint, ¶¶ 26, 34.  The Ninth Circuit recognizes three types of claims under the FMLA:  (1) interference claims, when an employer interferes with an employee's exercise of rights under the FMLA, 29 USC § 2615(a)(1); (2) retaliation claims, when an employer discriminates against an employee for instituting or participating in proceedings or inquiries under FMLA, 29 USC § 2615(b); and (3) discrimination claims, when an employer discriminates against an employee for opposing any practice prohibited by the FMLA, 29 USC § 2615(a)(2). *Bachelder v. Am. W. Airlines, Inc.*, 259 F3d 1112, 1124 (9th Cir 2001).  Although styled as a "retaliation" claim (Complaint, ¶ 26), Benz's FMLA claim – as well as his OFLA claim – are more properly analyzed as claims for "interference" with his FMLA rights because they rely on allegations of chilling Benz's statutory right to take FMLA (and OFLA) leave.  *See Xin Liu v. Amway Corp.*, 347 F3d 1125, 1135 (9th Cir 2003); *Bachelder*, 259 F3d at 1124.

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.  29 USC § 2615(a)(1).  To establish an interference claim under the FMLA, Benz must show that:  (1) he exercised his rights under the FMLA; (2) WLPC subsequently engaged in conduct that tended to chill the exercise of his FMLA rights; and (3) WLPC's conduct was motivated by the exercise of his FMLA rights.

*Bachelder*, 259 F3d at 1124-26.  In addition, Benz must show that the interference caused him

prejudice.  *Downey v. Strain*, 510 F3d 534, 540 (5th Cir 2007) ("the FMLA's remedial scheme

. . . requires an employee to prove prejudice as a result of an employer's noncompliance"), citing

*Ragsdale v. Wolverine World Wide, Inc.*, 535 US 81, 89 (2002); *see also Pacosa v. Kaiser*

*Found. Health Plan of the Nw.*, 2011 WL 208205, at *10 (D Or January 21, 2011) (same).  Benz

may make a showing of prejudice by establishing that the FMLA violation "rendered him unable

to exercise [his FMLA rights] in a meaningful way, thereby causing injury."  *Conoshenti v.*

*Public Serv. Elec. & Gas Co.*, 364 F3d 135, 143 (3rd Cir 2004).

OFLA is to "be construed to the extent possible in a manner that is consistent with any

similar provisions of" the FMLA.  ORS 659A.186(2).  Consistent with this legislative directive,

Oregon courts look to federal law when interpreting the OFLA.  *See Yeager v. Providence Health*

*Sys. Or.*, 195 Or App 134, 140-41, 96 P3d 862, 866 (2004); *Centennial Sch. Dist. No. 28J v. Or.*

*Bureau of Labor & Indus.*, 169 Or App 489, 500-01, 10 P3d 945, 951 (2000).

### B.  Position Reassignments

In August 2008, WLPC temporarily reassigned Benz to work as a Rereeler.  Benz

retained his bid as a Coaterman and stayed at the same Tech level despite the reassignment.  He

worked the same shift and had no change in his pay or benefits.  In May 2009, WLPC reassigned

Benz to work in Stock Prep.  Again, he suffered no decrease in pay, loss of benefits, changed

status, or lost promotional opportunities as a result of that reassignment.  WLPC contends that it

is entitled to summary judgment that Benz may not premise an FMLA or OFLA claim on the

August 2008 and May 2009 reassignments.  Benz concedes that his reassignment from

Coaterman to Rereeler in August 2008 cannot be basis for an OFLA action due to the one-year

statute of limitations applicable to that claim.  WLPC contends that, in addition to that time bar, Benz is unable to show any prejudice flowing from the reassignments sufficient to sustain an FMLA or OFLA claim.  WLPC is correct.

In order to prevail on an FMLA claim, "an employee must prove, as a threshold matter, that the employer violated § 2615 by interfering with, restraining, or denying his or her exercise of FMLA rights.  Even then, [the damages provision of FMLA] § 2617, provides no relief unless the employee has been prejudiced by the violation." *Ragsdale*, 535 US at 89.  Furthermore, the "FMLA provides only actual economic damages, and no damages for emotional distress." *Davis v. Pac. Saw and Knife Co*., 2009 WL 936471, at * 14 (D Or April 6, 2009).  Benz seeks $55,554.00 in economic damages on his FMLA claim (Complaint, ¶ 28) and the same amount in "lost wages, fringe benefits and future lost wages and fringe benefits" on his OFLA claim (*id*, ¶ 36).  At oral argument, Benz's attorney clarified that this damage figure is based on Benz's termination and includes only the approximate amount of his lost wages and benefits through the filing date of this case.

Benz contends that neither the Rereeler position nor the Repulper position had the same privileges, prerequisites, or status as the Coaterman position.  He also contends that the move to the Rereeler position was not as "desirable" as the Coaterman position.  However, other than those conclusory assertions, Benz has wholly failed to explain how he was prejudiced – and in particular how he was *economically* prejudiced – by the August 2008 and May 2009 reassignments.  His subjective beliefs that he was prejudiced or that the positions to which he was reassigned are somehow less "desirable" than his job as a Coaterman are an insufficient

basis on which to premise either an FMLA or an OFLA claim.  Accordingly, the reassignments

do not, in and of themselves, constitute a basis for either claim.

### C.  **Events Leading to Termination**

In addition to his two reassignments in August 2008 (Rereeler) and May 2009 (Stock

Prep), Benz cites two other employment actions as support for his contention that his taking of

medical leave constituted a negative factor in WLPC's decision to terminate him.  Those are the

alleged denial of half a shift off on April 29, 2009, and the issuance of the LCA on May 8, 2009.

However, the record simply does not support the conclusion that either of those events were

related to Benz's use of medical leave.

It is undisputed that Benz was never denied any medical leave, and Benz cites no

evidence that WLPC considered his use of medical leave in any of its employment decisions.

Nevertheless, he contends that WLPC denied him half a shift off the night before his third

surgery.  WLPC points out that despite the eleventh-hour nature of Benz's request, Kestek and

Benz jointly agreed that Benz's supervisor (Kendig) could try and get Benz off work early that

night.  WLPC also offers ample documentary and testimonial evidence that the LCA resulted

from its belief that Benz had ongoing performance issues and had walked off the job.  In

addition, WLPC has submitted undisputed evidence that the purpose of the reassignment to

Stock Prep was to remove Benz from what had become a tense working environment on PM #3

and give him time to reestablish himself as part of the paper machine crew.  Finally, WLPC

submits that it fired Benz for failing to comply with the terms of the LCA which required him to

"follow to successful completion all [the] recommendations" of the EAP. Oberlin Decl., Ex. 9.

Benz testified that he thought he had been given permission to leave his shift when Kendig said "Okay, I'll see you next week" in response to Benz's statements that he was angry and could not work with Bugni after their altercation.  However, this apparent misunderstanding is not sufficient to save Benz's claims.  Kendig's statement is at best ambiguous, and Benz testified that he never asked Kendig for permission to go home.  Within a few hours after Benz left work, Kendig wrote an email to McGuigan, Bill Benz, and Kestek advising that Benz had called him "in a very pissed off manner [and said] that he was going home."  Dunlap Decl., Ex. 17.  Kestek considered Benz to have walked off the job.  Kestek Depo., p. 46.

At the May 5, 2009 meeting, Benz told WLPC management that he "thought he had the OK from [Kendig]" to leave work early.  Dunlap Decl., Ex. 18, p. 1.  Ultimately, however, they did not believe Benz.  The LCA clearly identifies Benz's action as walking off the job without authorization, and Benz never challenged any of the statements in the LCA prior to his termination.  Oberlin Decl., Ex. 9; Benz Depo., pp. 249-50.  In other words, all the evidence in the record indicates that every WLPC supervisor and manager involved in the decision to issue the LCA and reassign Benz to Stock Prep believed that he had walked off the job.  Issuance of the LCA was a legitimate response to the concerns raised by Benz's prior performance record and apparent job walkoff which provides no traction to Benz's argument that it was related to his use of medical leave.

Similarly, Benz's termination is connected to his surgery by nothing more than circumstantial timing.  It is undisputed that Benz violated the terms of the LCA by failing to show up for an EAP appointment.  Although Benz did not think it was a "big deal" to have missed an EAP appointment and thought he would be allowed to reschedule it, WLPC viewed

his missing that appointment as tantamount to missing work.  In short, the record

overwhelmingly supports WLPC's contention that its employment actions were taken to address

legitimate concerns and not to discourage Benz from taking medical leave.

Although he has provided no direct evidence that WLPC interfered with his use of

medical leave, Benz cites several other events as evidence of WLPC's intent to interfere with his

taking of medical leave or evidence discriminatory intent for purposes of his discrimination

claim,[7] namely:  (1) a comment by Bill Benz some time prior to Benz's first surgery in August

2008 that he "had a cure" for Benz's throat condition; (2) the January 2009 dispute over whether

WLPC's bereavement leave policy applied to the death of a step-grandparent; and (3) the

requirement that he provide a medical release before returning to work in May 2009.  However,

the single comment by Bill Benz is neither connected by content to Benz's use of medical leave

nor sufficiently close in time to Benz's termination to provide the necessary link.  The remaining

two events simply evidence actions by WLPC to either interpret or enforce the provisions of its

leave policies.  Whatever the relative merits of Benz's contention that he should have been

allowed PTO for his step-grandfather's death, there simply is no evidence that the denial of that

leave was in any way connected to his throat condition or the exercise of his right to take medical

leave.  That dispute arose over four months after Benz's first throat surgery and a month after he

returned to work from his second throat surgery.  Benz has provided no evidence that Bill Benz's

act of challenging his use of bereavement leave was in any way related to his medical condition

or taking of medical leave.  Finally, Benz has cited nothing to support the conclusion that

---

[7] At oral argument, Benz's attorney clarified that references to these three events are not cited only as evidence of intent and not as separate adverse actions on which Benz bases any claim.

WLPC's requirement that he provide a medical release before returning to work after his third

surgery interfered with his use of medical leave.  WLPC's policies required work releases

following a return to work after FML.  Dunlap Decl., ¶ 10; Ex. 1, p. 11; Ex. 2, pp. 11-12; Ex 3,

p.1.  Enforcement of that policy reflects nothing more than an employer ensuring that an

employee is able to return to work and assisting in arranging for any necessary work

modifications.

    In sum, Benz has provided insufficient support for his leave act claims because the events

he cites are either too remote in time to support his claims, do not establish any prejudice to him,

or because the record does not support the conclusion that the adverse actions taken against him

were in any way causally related to his use of medical leave.  Accordingly, WLPC should be

granted summary judgment against the Second and Third Claims.

### III.  Disability Discrimination Under ORS Chapter 659A (First Claim)

    Benz's remaining claim is for disability discrimination in violation of ORS Chapter

659A.  Benz alleges that WLPC failed to accommodate his recurring vocal chord lesion by

providing him with a work environment "which did not require him to speak frequently and/or

loudly."  Complaint, ¶ 13.  Benz also alleges that this medical condition rendered him a "person

with a disability" for purposes of ORS 659A.100(1)(c) (2007)[8] and that his disability was a

motivating factor in WLPC's decision to terminate him.  WLPC moves for summary judgment

against this claim because:  (1) Benz did not suffer from a "disability" for purposes of

ORS Chapter 659A; (2) it could not have discriminated against him because it was unaware of

---

[8]  ORS Chapter 659A underwent substantial revision in 2009, with the amendments effective January 1, 2010, nearly six months after Benz's termination by WLPC.  All citations to sections of ORS Chapter 659A are to the 2007 version.

his alleged disability and need for accommodation; and (3) there is no causal link between his

medical condition and any of the disciplinary actions taken by WLPC.

### A.  Legal Standard

Although Benz brings no claim under the Americans with Disabilities Act ("ADA"),

Oregon's disability discrimination statute, ORS 659A.112(2), is to be "construed to the extent

possible in a manner that is consistent with any similar provision of" the ADA.  ORS 659A.139

(2007).  A *prima facie* case of disability discrimination requires proof that the plaintiff: (1) is a

qualified individual with a disability; (2) suffered an adverse employment action; and (3) that a

causal connection exists between the adverse employment action and the disability.  *Austin v.*

*Wal-Mart Stores, Inc.*, 2008 WL 4936480, at *11 (D Or Nov. 14, 2008).  WLPC contends that

Benz cannot meet any of the elements necessary to establish this claim.

### B.  No "Disability"

WLPC first argues that Benz's throat condition does not constitute a disability for

purposes of ORS Chapter 659A.  Benz contends that his throat lesion was an impairment which

episodically substantially interfered with his ability to communicate, speak, sleep and breathe

normally.  A "disability" is a physical or mental impairment that substantially limits one or more

major life activities, and "communication" is a major life activity.  ORS 659A.100(1)(a) & (c)

(2007).  Prior to the 2009 amendments, ORS 659A.100(d) (2007) provided that "substantially

limits" means:

> (A) The impairment renders the individual unable to perform a
> major life activity that the average person in the general population
> can perform; or
> (B) The impairment significantly restricts the condition, manner or
> duration under which an individual can perform a particular major

> life activity as compared to the condition, manner or duration
> under which the average person in the general population can
> perform the same major life activity.

At all relevant times, the regulations interpreting the ADA advised that certain factors "should be considered in determining whether an individual is substantially limited in a major life activity," including:  "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 CFR § 1630.2(j)(2).  Based on those interpretive factors, federal courts considering ADA claims have found episodic or recurring impairments to not constitute disabilities for purposes of the ADA unless they recur with sufficient regularity.  For instance, in *Fraser v. Goodale*, 342 F3d 1032, 1044 (9th Cir 2003), *cert denied*, 541 US 937 (2004), the Ninth Circuit found that the plaintiff failed to create an issue of fact as to whether she was substantially limited in the major life activity of thinking where the evidence showed that she had suffered insulin reactions sufficiently severe to limit her thinking only three times in a five month period.  *See also*, *Sanders v. Arneson Prods., Inc.*, 91 F3d 1351, 1353-54 (9th Cir 1996) (noting that "[s]everal courts have held that a temporary injury with minimal residual effects cannot be a basis for a sustainable claim under the ADA" and finding that a psychological impairment lasting just under four months did not qualify as a "disability" for purposes of the ADA) (citations omitted); *Burns v. Snow*, 130 Fed Appx 973, 982 (10th Cir 2005) (finding that "lupus flare-ups" resulting in "difficulty walking and standing on three or four occasions [over the course of] eleven months of employment" are insufficient to establish a disability).

In contrast, two years after its decision in *Fraser*, the Ninth Circuit found that a plaintiff

had created an issue of fact as to a disability where he asserted that his mental disorder:

> greatly affected my short-term memory and ability to concentrate both
> before and after I was hospitalized.  I could not stay focused on something
> for more than brief periods.  I did not have much of a short-term memory
> at all.  I had to be repeatedly reminded of appointments, or tasks I had to
> do. . . . If I looked at written material for too long things just got jumbled
> in my mind and I would have to stop.  I could not sit and focus on an entire
> television show.  In the fall of 2001 I quit school because of my inability to
> focus or concentrate adequately.

*Head v. Glacier Nw, Inc.*, 413 F3d 1053, 1061 (9th Cir 2005) (ellipsis in original).

Unlike *Fraser*, *Head* involved a plaintiff who missed nearly two months of work due to

his disability.  He suffered from a "much more persistent problem with his ability to think than

that found insufficient in *Fraser*," and his "ability to think was almost constantly impaired at

some level."  *Id*.

The record in this case falls much closer to the scenario presented in *Fraser* than in *Head*.

Benz contends that he suffered from difficulties speaking and communicating for as many as six

months in the beginning of 2008.  His throat lesion flared sufficiently in August and November

2008, and again in late March 2009, to require three surgeries.  For the weeks preceding those

surgeries, Benz had a "changed" voice, difficulty sleeping, and difficulty catching his breath, all

of which interfered with his ability to communicate with coworkers and management at WLPC.

However, once Benz had surgery, he recovered within a week or two, with no further symptoms

until another flare up about three months out.  In sum, Benz had three flare-ups of his vocal

chord lesion between mid-2008 and mid-2009.   Initially those flare-ups caused voice changes

and hoarseness, but did not prevent Benz from working.  Post-surgery recovery took two to three

weeks and imposed no need for follow up treatment other than for Benz to "focus on voice rest" and avoid exposure to "secondary irritants" (either inhaled or acid reflux) which might cause the lesion to recur.  Zamudio Depo., pp. 24, 40 & Ex. 13 (released to work May 18, 2009).[9]

Benz contends that his condition qualifies as a disability under an Oregon statute which provides that an "impairment that is episodic or in remission is considered to substantially limit a major life activity of the individual if the impairment would substantially limit a major life activity of the individual when the impairment is active."  ORS 659A.104(3) (2009).  However, that statute was not enacted until 2009 and did not become effective until January 2010, some six months after Benz's termination.  At the time of Benz's termination, it is clear that interpreting ORS 659A.112 consistently with the ADA results in a finding that Benz's vocal cord lesions did not occur with sufficient regularity to render them disabling for purposes of Oregon's disability discrimination statutes.

Even were this court to conclude that the number or duration of Benz's flare-ups of his throat lesions sufficient, case law suggests that his longer lasting restrictions in speaking and communicating also do not qualify him as disabled.  Benz testified that his voice became hoarse and difficult to understand as a result of his throat lesions.  However, a substantial limitation in speaking or communicating requires more than being limited in "talking constantly, for a long time, and under stress."  *Becerril v. Pima County Assessor's Office*, 587 F3d 1162, 1164 (9th Cir 2009) (citation omitted).  Thus, while Benz's symptoms of hoarseness and a "weird" voice lasted

---

[9] Although Benz was released to work a week after his August and December  2008 surgeries, at that point, the actual cause of the lesion was undiagnosed and both Benz and his doctor thought the growth was a fatty tissue tumor.  Given Dr. Zamudio's testimony, this court assumes in Benz's favor that full recovery from the first two surgeries was closer to two or three weeks.

a longer period of time than the few incidents of breathing and sleeping difficulties he recounted, they are not severe enough to be considered substantially limiting for purposes of a disability discrimination claim.

## C. **Remaining Arguments**

The conclusion that Benz's throat lesions do not qualify as a "disability" for purposes of the relevant version of ORS Chapter 659A is sufficient by itself to grant summary judgment in favor of WLPC. However, this court briefly touches WLPC's remaining arguments, namely that there is no causal connection between Benz's alleged disability and any adverse employment actions and that, in any event, Benz failed to request any accommodation, thus triggering no interactive process. These arguments provide further support for granting summary judgment to WLPC.

### 1. **Lack of a Causal Connection**

First, WLPC argues that Benz has failed to establish a causal link between his alleged disability and any adverse employment actions. Benz has offered no direct evidence of discriminatory intent. Instead, Benz relies entirely on the timing between his third surgery and four related events (alleged denial of half a shift off before surgery, issuance of the LCA, reassignment to Stock Prep, and termination) to support his claims. However, just as the circumstances surrounding these events do not support the conclusion that they interfered with Benz's use of medical leave, they also fail to support the conclusion that they were motivated by unlawful discrimination against Benz due to his medical condition.

In a variety of contexts, the Ninth Circuit has declared that "proximity in time may support an inference of retaliation sufficient to survive summary judgment." *Anthoine v. N.*

*Central Counties Consortium*, 605 F3d 740, 751 (9th Cir 2010) (citing cases in First Amendment

retaliation and Title VII context); *see also Hodgens v. Gen. Dynamics Corp*., 144 F3d 151, 168

(1st Cir 1998) (noting in FMLA context that "close temporal proximity between two events may

give rise to an inference of causal connection," and citing cases in FMLA and Title VII context).

However, the surrounding circumstances may sufficiently undermine any inference of

discriminatory intent to render summary judgment appropriate.  In particular, where the employer

offers legitimate reasons for its actions and "evidence to refute the defendant's legitimate

explanation is totally lacking, summary judgment is appropriate even though plaintiff may have

established a minimum *prima facie* case." *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 890-91 (9th Cir

1994); *see also Otsyula v. Oregon Dept. of State Lands*, 2008 WL 5246092 (D Or Dec. 16, 2008)

(citing *Wallis* and granting summary judgment in race and national origin discrimination case

where plaintiff failed to counter evidence of a "well documented progressive disciplinary

history").  This is such a case.

As adverse actions to support his disability discrimination claim, Benz points to the

denial of half a shift off the night before his third surgery on April 29, 2009, the issuance of the

LCA and related reassignment to Stock Prep,[10] and his June 2009 termination.  Benz has offered

no direct evidence that any of these adverse employment actions[11] were causally linked to

discriminatory intent related to his throat condition.  The only circumstantial evidence he offers

---

[10]  As discussed above, the reassignment back to the position of Rereeler in August 2008 is time-barred because it took place more than one year prior to the filing of this action.

[11]  As discussed above, the reassignments caused no economic prejudice to Benz.  The record also indicates that the reassignments did not affect Benz's ability to advance within WLPC.  Accordingly, it is debatable that they qualify as "adverse" actions sufficient to support Benz's claim for violation of ORS Chapter 659A. *See Steele v. Mayoral*, 231 Or App 603, 616-17, 220 P3d 761, 770 (2009) (discussing requirement that employment actions must be "materially adverse" in order to support discrimination claim).

is the temporal proximity between his third surgery in late April 2009 and these events. However, just as these events evidence no intent to interfere with Benz's use of medical leave, they evidence no discriminatory intent related to Benz's medical condition.

As discussed above, after Benz called shortly before the start of his April 29, 2009 shift and related his concerns about not being able to eat or drink for the hours before his surgery, Kestig and Benz agreed that he would go to his assigned shift and see if Kendig could release him after half a shift. However, before reaching that midway point, Benz left work after getting into an altercation with Bugni. The record reveals that Benz may have misunderstood Kendig's ambiguous statement that he would "see [him] next week." However, all subsequent evidence indicates that WLPC's supervisors and managers interpreted Benz's conduct as a job walkoff and either did not believe Benz's explanation or viewed Benz as responsible for any misunderstanding, prompting them to issue the LCA. The language of the LCA reflected this decision and was not challenged by Benz. The related reassignment to Stock Prep did not prejudice Benz in terms of pay or benefits, and all evidence indicates that it was designed to calm the tensions that had developed on the PM #3 shift crew. His June 2009 termination followed what Benz acknowledges was a violation of the terms of the LCA, although he quibbles with the gravity of his offence.

Nothing in the record – other than the timing of the adverse actions in relation to Benz's third surgery – supports any inference that they were driven by discriminatory animus. Instead, the remainder of the record overwhelmingly supports the conclusion that the timing of these events was purely coincidental. In sum, Benz has wholly failed to provide evidence to establish any inference that WLPC's disciplinary actions were premised upon discriminatory intent related

to Benz's throat conditions or the associated impairments.  Accordingly, for this additional

reason, WLPC should be granted summary judgment against the First Claim.

## 2.  **Failure to Engage in Interactive Process and/or Accommodate**

Benz alleges that WLPC failed to provide "the reasonable accommodation of being

permitted to work in an environment which did not require him to speak frequently and/or

loudly."  Complaint, ¶ 13.[12]  WLPC argues that, to the extent the First Claim is premised on a

failure to accommodate, it fails for lack of proof that Benz made any request for an

accommodation.  Once again, WLPC is correct.

An employer may be held liable where it fails or refuses to engage in an "interactive

process" with a disabled employee to identify reasonable accommodations which would allow

the employee to perform essential job duties.  *Humphrey v. Mem'l Hosps. Ass'n*, 239 F3d 1128,

1137-38 (9th Cir 2001) (ADA); OAR 839-006-0206(6).  The interactive process is

triggered by an employee's request for an accommodation:[13]  "the interactive process . . . is

triggered by an employee or an employee's representative giving notice of the employee's

disability and the desire for accommodation."  *Barnett v. U.S. Air, Inc.*, 228 F3d 1105, 1114 (9th

Cir 2000) (interpreting ADA), *vacated in part on other grounds by U.S. Airways, Inc. v. Barnett*,

---

[12] Although not specifically identified in his pleadings as an accommodation he was denied, Benz contended that WLPC also failed to allow him half a shift off the night before his third surgery.  Complaint, ¶ 6 (describing incidents of April 29, 2009).  However, as previously discussed, Kestig authorized Kendig to determine whether he could let Benz off early, but Benz left before working half a shift after getting into an altercation with Bugni.

[13] In limited circumstances, the interactive process may be triggered by the employer's recognition of the need for an accommodation.  *Brown v. Lucky Stores, Inc.*, 246 F3d 1182, 1188 (9th Cir 2001) (analyzing ADA claim).  However, as in *Brown*, the record in this case "does not show that [Benz] was unable to request a reasonable accommodation, or that [WLPC] knew or had reason to know that [Benz] had a disability preventing h[im] from making such a request."  *Id*.  Accordingly, the exception to the general rule is inapplicable here, and the onus was on Benz to request a reasonable accommodation.

535 US 391 (2002). As does federal law, Oregon law places the burden of initially informing the

employer of the need of an accommodation on the employee:

> Once a qualified employee . . . with a disability has requested
> reasonable accommodation or otherwise disclosed to the employer
> a disability that may require reasonable accommodation, the
> employer has a duty to initiate a meaningful interactive process
> with the employee . . . to determine whether reasonable
> accommodation would allow the employee . . . to perform the
> essential functions of a position held or sought.

OAR 839-006-0206(4).

"Employers cannot assume employees are disabled and need accommodations." *Taylor*

*v. Phoenixville Sch. Dist.*, 184 F3d 296, 313 (3rd Cir 1999). The standard for putting an employer

on notice is fairly low, requiring the employee to only "inform the employer of a need for an

adjustment due to a medical condition using plain English and need not mention the ADA or use

the phrase reasonable accommodation." *Barnett*, 228 F3d at 1112. However, the employer's

duty is not triggered unless the employee or his representative "provides the employer with

enough information that, under the circumstances, the employer can be fairly said to know of

both the disability and desire for an accommodation." *Taylor*, 184 F3d at 313; *see also Summers*

*v. A. Teichert & Son*, 127 F3d 1150, 1153 (9th Cir 1997) (no triable issue of fact where employee

did not request accommodation); *Wells v. Mut. of Enumclaw*, 2005 WL 2035066, at *6 (D Idaho

Aug. 22, 2005) (plaintiff's "limited statement regarding his illness does not rise to the level of

establishing a need for accommodation.") It is undisputed that Benz never requested any

accommodation for his vocal chord lesion. As a result, WLPC was never under any obligation to

engage in an interactive process with Benz in an effort to identify a workable accommodation.

Following his first two surgeries, neither Benz nor Dr. Rydland knew what was causing the recurring growth in Benz's throat. The health care certification for the August 2008 surgery indicated that Benz might need only a few days to one or two weeks off or light duty, and that Dr. Rydland did not expect any long term need for medication or treatment after surgery. Oberlin Decl., Ex. 6. Benz knew of no restrictions on his ability to work from Dr. Rydland. Benz Depo., p. 180.

The doctor's note from the second surgery similarly does not indicate any work related restrictions. Instead, it simply says that Benz "is to avoid vigorous activity" for one week. *Id*, Ex. 28. Again, Benz was not advised to avoid any other activities and returned to work a week post-surgery. *Id,* p. 210. There is simply no indication that WLPC received any information from Benz or Dr. Rydlund that Benz's recurring throat condition imposed a need for an accommodation following his return to work.

Two weeks after Benz's third surgery, Dr. Zamudio signed a medical visit report indicating that Benz could return to work on May 18, 2009, with an instruction to "focus on voice rest" until his next appointment. Dunlap Decl., Ex. 25. Benz contends that he did not know he had any medical restrictions when he went back to work on May 18, 2009, because he never saw the May 15, 2009 medical visit report.[14] Benz Depo., pp. 72-74, 263, 265. Nevertheless, Benz seems to contend that the May 15, 2009 report triggered WLPC's obligation to follow up by initiating a good faith interactive process, which it failed to do. However, Benz

[14] Dr. Zamudio testified that she repeatedly advised Benz that he needed "voice rest," meaning no whispering and no talking louder than a conversational tone. Zamudio Depo., pp. 38-40, 47-51, & Ex. 12, p. 3 (5/12/2009 follow up appointment, advised to "focus on voice rest"). They discussed Benz returning to work and they discussed him using a microphone to communicate with the people he supervised. *Id*, pp. 47-48. Benz assured her he would find out what he could do at work to avoid exposures to irritants and maintain a quiet voice. *Id*, pp. 39-40, 47-48.

did not request – and the report from Dr. Zamudio does not specify the need for – any particular

work accommodation.  Instead, the report simply advises that Benz should "focus on voice rest"

to avoid a recurrence.  WLPC was under no obligation to engage in an interactive process with

Benz unless and until he took the preliminary step of asking for an accommodation.  He did not

do so.

        When Benz arrived at work, he met with Dunlap, but does not recall what Dunlap said.

*Id*, p. 267.  However, Dunlap recalls asking Benz whether he could do the Repulper job and

abide by his restrictions in the May 15, 2009 report, to which Benz responded that "it would not

be a problem."  Dunlap Decl., ¶ 43.  Whatever can be made of that conversation, the record is

devoid of evidence that Benz requested any accommodation during the weeks that followed.  To

the contrary, Benz continued working for WLPC into early June 2009.  Whether Dunlap actually

discussed the "focus on voice rest" restriction with Benz (which he does not recall) and whether

Benz saw the May 15, 2009 report (which he denies), the ball was in Benz's court.  He did not

ask for an accommodation and cannot now fault WLPC for failing to engage in an interactive

process which his silence did not trigger.

        The May 15, 2009 medical visit report is insufficient as a matter of law to constitute a

request for an accommodation which triggered an obligation by WLPC to initiate an interactive

process.  Accordingly, for this additional reason, WLPC should be granted summary judgment

against the First Claim insofar as it is premised upon an alleged failure to reasonably

accommodate.

///

///

## RECOMMENDATION

For the reasons stated above, defendant's Motion for Summary Judgment (docket #17) should be GRANTED, and Judgment should be entered in favor of defendant.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due June 20, 2011.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

DATED this 2nd day of June, 2011.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge